**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-114 (ACR)** |
| **v.** | : | |
| | : | |
| **KYLE ALAN MLYNAREK AND** | : | |
| **RONALD MICHAEL BALHORN,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth below, the government requests that this Court sentence Defendant Kyle Mlynarek to nine months of incarceration (at the low end of the Mlynarek's guidelines range of 8-14 months' imprisonment), 12 months of supervised release, and $500 in restitution, and Defendant Ronald Balhorn to 13 months of incarceration (at the low end of Balhorn's guidelines range of 13-18 months' imprisonment), 12 months of supervised release, and $500 in restitution.

### I.      Introduction

Defendants Kyle Mlynarek, 28, and Ronald Balhorn, 54, both demolition workers in the Detroit area, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote

1

count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Mlynarek pled guilty, without a plea agreement, to:

- entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1);

- disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2);

- disorderly conduct in a capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and

- parading, demonstrating, or picketing in a capitol building, in violation 40 U.S.C. § 5104(e)(2)(G).

The government's sentencing recommendation is supported by Mlynarek's conduct: (1) Mlynarek encouraged riotous behavior, at various times yelling "let's go" to the riotous mob; (2) Mlynarek spent a significant period of time (almost half an hour) in the Capitol building and traveled to various locations while inside; (3) Mlynarek joined a mob which was attacking officers on the West Lawn of the Capitol (an attack on officers that one witness likened to his time in Afghanistan); (4) Mlynarek engaged in a physical altercation with a United States Capitol Police officer on the Northwest Terrace; and (5) Mlynarek showed a lack of remorse, including texting

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Balhorn shortly after the riot and stating that they should have stayed in the riotous mob longer and generally bragging about his crimes through social media (*e.g.*, sending a photo of the U.S. Capitol steps captioned, "took this bitch over").

Following a bench trial, Balhorn was found guilty of:

- entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1);

- disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); and

- parading, demonstrating, or picketing in a capitol building, in violation 40 U.S.C. § 5104(e)(2)(G).

The government's sentencing recommendation is supported by Balhorn's conduct: (1) Balhorn invited and transported his co-defendant and cousin, who was half Balhorn's age at the time, to Washington, D.C.; (2) Balhorn spent a significant period of time (almost half an hour) in the Capitol building and traveled to various locations while inside; (3) Balhorn engaged in a physical altercation with law enforcement (shoving an officer on the Northwest Terrace); (4) Balhorn showed a lack of remorse, including asserting in a text message that "we will continue to have a civil unrest until the government handles it's [sic] responsibilities properly"; and (5) Balhorn minimized his conduct when testifying.

The Court must also consider that the defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the Congressional proceedings scheduled to occur that day. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Mlynarek's crime support a sentence of nine

months of incarceration, 12 months of supervised release, and $500 in restitution, and the facts and circumstances of Balhorn's crime support a sentence of 13 months of incarceration, 12 months of supervised release, and $500 in restitution in this case.

## II.   Post-Trial Legal Standards

The legal standards for sentencing are different from those at trial.

*First*, in determining a sentence, a court is not confined only to the findings of fact, or even to the trial record.  *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 185 (D.D.C. 2018) ("Throughout this Guidelines calculation process, the Court is not confined to the jury's factual findings or even to the trial record.").  "Rather, the Court may consider all of a defendant's 'relevant conduct'—a set of acts defined in Chapter 1 of the Guidelines."  *Id.*  Such relevant conduct includes, among other things:

- "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;" and

- "all harm that resulted from the acts and . . . and all harm that was the object of such acts and omissions."  U.S.S.G. §§ 1B1.3(a)(1), (3).

In other words, the Guidelines and case law allow the Court to consider all of a defendant's relevant conduct, even that which was not in the trial record.

*Second*, "[r]elevant conduct need only be established by a preponderance of the evidence. *United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015); *see also United States v. Watts*, 519 U.S. 148, 156 (1997) ("The Guidelines state that it is 'appropriate' that facts relevant to sentencing be proved by a preponderance of the evidence, [U.S.S.G.] § 6A1.3, comment., and we have held that

application of the preponderance standard at sentencing generally satisfies due process."); *United States v. Long*, 328 F.3d 655, 670 (D.C. Cir. 2003) ("This court, for its part, has noted the split among the circuits on this issue but has declined to require more than the preponderance standard at sentencing.").

So long as that the preponderance of evidence standard is met, "'a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence.'" *Abu Khatallah*, 314 F. Supp. 3d at 185 (quoting *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008)); *see also United States v. Williams*, 827 F.3d 1134, 1165–66 (D.C. Cir. 2016) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction or increase the statutory mandatory minimum.") (internal citation omitted); *United States v. Bell*, 795 F.3d 88, 104–05 (D.C. Cir. 2015) (explaining that relevant conduct considered at sentencing may also include acquitted conduct, "so long as the sentence does not exceed the statutory maximum and is based on conduct established by a preponderance of the evidence"); *United States v. Bagcho*, 923 F.3d 1131, 1141 (D.C. Cir. 2019) (affirming the district court's consideration of uncharged and acquitted conduct in calculating the defendant's Guidelines range).

Accordingly, the Court can consider uncharged or acquitted conduct, so long as it is both relevant and meets the preponderance of evidence standard. Indeed, this Court recognized this very possibility, acknowledging that its acquittals were rooted in the beyond a reasonable doubt standard applicable to a criminal trial, rather than the preponderance of the evidence standard used in connection with sentencing. *See* Transcript, *U.S. v. Mlynarek et al.*, 23-CR-0114-ACR, at 132

(October 17, 2023) ("I don't see how this video gets you there . . . [o]n beyond a reasonable doubt. I mean, maybe if we were on preponderance of the evidence, maybe I might feel differently.").[2]

*Third*, "[a]fter determining the proper Guidelines range, the Court must consider factors that Congress set forth in 18 U.S.C. § 3553(a) as bearing on the proper sentence." *Abu Khatallah, 314 F. Supp. 3d at 185.* "In arriving at the proper sentence, the Court may consider 'any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.'" *Id.* (quoting U.S.S.G. § 1B1.4).

### III.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1 (Criminal Complaint Statement of Facts) at 1-2; ECF No. 50 (Statement of Elements and Elements and Facts for Change of Plea Hearing) at 2-4.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

---

[2] During the 2022-2023 amendment cycle, a proposed amendment was introduced that would have prohibited acquitted conduct from being considered relevant conduct in determining a defendant's Guidelines range, except in very limited circumstances. *See* Proposed Amendments to the Sentencing Guidelines (Preliminary) January 12, 2023 < https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230112_prelim_RF.pdf > at 215-228. This amendment received extensive public comment. *See* Public Comment From March 14, 2023, Sample of Public Comment Received on Proposed Amendments, 88 FR 7180 < https://www.ussc.gov/policymaking/public-comment/public-comment-march-14-2023#acq>. Despite considering a proposed amendment that would have prohibited the use of acquitted conduct in the specific manner the Government advocates for here, the Commission decided not to adopt that amendment in the 2023 Guidelines. *See* U.S. SENT'G COMM'N, GUIDELINES MANUAL §3E1.1 (Nov. 2023), < https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2023/GLMFull.pdf >.

*Defendants Mlynarek's and Balhorn's Role in the Attack on the Capitol*

On January 6, 2021, Mlynarek and Balhorn, attended the "Stop the Steal" rally on the Ellipse.  When that rally concluded, they traveled along the National Mall, eventually trespassing onto restricted Capitol grounds.

Around 2:00 p.m., as U.S. Capitol Police officers on the West Front of the Capitol were trying to hold back thousands of rioters from entering the building, a Civil Disturbance Unit ("CDU") of Metropolitan Police Department ("MPD") officers, CDU-42, attempted to come to their rescue.  CDU-42 fared no better, however, and were actually in a considerably worse situation: trying to approach the Capitol from the lawn, the approximately 32 officers were quickly surrounded by thousands of rioters, who separated, surrounded, and attacked the officers. One officer compared the January 6 attack to his tour in Afghanistan.  *See* Transcript, *U.S. v. Mlynarek et al.*, 23-CR-0114-ACR, at 150 (October 16, 2023 ("I was in Afghanistan in 2001, ma'am. . . .  It's eerily similar . . . .").

At approximately 2:01 p.m., CDU-42 officers attempted to push forward, but were stopped by the riotous crowd who pushed and shoved the officers.  In audio of several body-worn cameras ("BWCs") of CDU-42 officers, an officer can be heard shouting "10-33," which means that an officer is in need of assistance, and then saying, "We're being trampled."

Mlynarek and Balhorn participated in that melee.  Despite Balhorn saying otherwise, this Court found that the defendants must have seen law enforcement officers prior to climbing down from a ledge and joining the crowd, which was pushing against the group of officers who were trying to make it to safety.  *See* Transcript, *U.S. v. Mlynarek et al.*, 23-CR-0114-ACR, at 179 (October 18, 2023) ("I do not find credible that he didn't know that there were police right in front of him while he was standing on that ledge."). Specifically, Balhorn, followed by Mlynarek,

both got down from their position above the officers to a position directly in front of the officers. *See* Images 1 & 2 (Balhorn and Mlynarek are circled in red, with Balhorn wearing a black sweat shirt and Mlynarek wearing a gray sweat shirt).

*Image 1 (Screenshot from Exhibit 316 at 00:05)*
(Balhorn and Mlynarek looking down in the direction of rioters confronting officers in riot gear)



*Image 2 (Screenshot from Exhibit 316 at 00:09)*
(Balhorn and Mlynarek stepping down a ledge towards rioters confronting officers)



Once in the scrum, Mlynarek and Balhorn encountered the MPD officers, menaced them, and impeded their mission. *See* Images 3–4.

*Image 3 (Screenshot from Exhibit 402 at 14:01)*
(Mlynarek pushing the riotous crowd as they attack officers)



*Image 4 (Screenshot from Exhibit 402 at 14:01)*
*(Balhorn pushing the riotous crowd as they attack officers)*



Lieutenant William Hackerman commanded the platoon of MPD officers who were being surrounded and attacked by rioters. Lieutenant Hackerman recounted the enduring trauma and alienation he felt as he and his platoon were attacked by a riotous mob, and likened it to his combat experience in Afghanistan:

> It's eerily similar in the sense that when you're with – I know it seems like you're all together and you have a group of people but when stuff breaks bad like this you kind of feel alone like you know you have people there to help you out and to try to get out of the situation, but once it goes bad you're like how am I going to get out of the situation, but then you're concerned about everybody else too, it's -- it's a difficult feeling to process, I'd say.

Transcript, *U.S. v. Mlynarek et al.*, 23-CR-0114-ACR, at 150 (October 16, 2023).  Similarly, then-Officer Abdulkadir Abdi testified:

> I was situated towards the middle back of the platoon.  As soon as we got into the crowd, I could see just all hell broke loose and I see the officers in front of me fighting, using their baton, being punched there's people throwing stuff at them.  And by the time I get

to the crowd, same thing continued. . . .  I can feel hard objects hitting my head, I've seen metal bats, sticks, flag poles.  [I was sprayed with] [b]ear spray as well.

Transcript, *U.S. v. Mlynarek et al.*, 23-CR-0114-ACR, at 103 (October 16, 2023).

After this confrontation on the West Lawn, at approximately 2:10 p.m., Mlynarek and Balhorn made their way to the Northwest Terrace and stood with a group of rioters who encountered metal barrier gates garrisnoed by U.S. Capitol Police Officers.  Balhorn and Mlynarek edged past the primary line of officers and headed east, where only a handful of officers were there to stop their advance.  One officer tried to prevent them from advancing.  Balhorn shoved the officer, and Mlynarek rushed back to help push the officer to the side.  *See* Images 5–9.[3]

*Image 5 (Screenshot from Exhibit 317 at 19:15)*
(Balhorn and Mlynarek engaged in a physical altercation with U.S. Capitol Police)



---

[3] The brightness of Images 5–9 have been increased by 25% for clarity.  Balhorn is circled in green.  Mlynarek is circled in yellow.

*Image 6 (Screenshot from Exhibit 317 at 19:14)*
(Mlynarek returns to the officer from behind while Balhorn shoves the officer)



*Image 7 (Screenshot from Exhibit 317 at 19:15)*
(Mlynarek pivots to face the officer, physically touching him at the knee while Balhorn pushes the officer)



*Image 8 (Screenshot from Exhibit 317 at 19:15)*
(Mlynarek further steps towards the officer while Balhorn continues pushing the officer)



*Image 9 (Screenshot from Exhibit 317 at 19:16)*
(Mlynarek leans his body forward, now with his right shoulder as identified by his gray sweatshirt against the officer, pushing the officer backwards away from Balhorn)



These officers, as one law enforcement witness described, "were trying to take up the place of the bike racks," as they were trying to stop additional rioters from advancing. *See* Transcript, *U.S. v. Mlynarek et al.*, 23-CR-0114-ACR, at 44 (October 17, 2023).  As Balhorn and

Mlynarek jostled with police officers, they contributed to the riot's success as they redirected law enforcement resources.  As Judge McFadden observed: "Of course, part of the danger of mobs is the sheer volume of people. Had [the defendant] or any one of his fellow rioters been in the Capitol alone, they could have quickly been dealt with by the police. [The defendant] by his presence and actions was also acting to protect and insulate the other rioters from arrest." Sentencing Transcript, *U.S. v. Chan*, 21-CR-668-TNM, at 15–16 (January 24, 2023).

A few minutes later, at approximately 2:22 p.m., Mlynarek and Balhorn entered the U.S. Capitol Building through the Senate Wing door.

Once inside the Capitol Building, Mlynarek and Balhorn traveled to several locations throughout the building.  They first entered the building's Crypt at around 2:27 p.m. At approximately 2:29 p.m., the group of rioters they were with pushed their way through officers and into a hallway. Mlynarek and Balhorn then walked upstairs to Statuary Hall around 2:29 p.m.

At approximately 2:31 p.m., Mlynarek and Balhorn entered the Statuary Hall Connector, which connects Statuary Hall to the entrance of the House Chambers.  Mlynarek and Balhorn were within the crowd for several minutes before the crowd pushed past a line of U.S. Capitol Police officers and into the next hallway near the entrance to the House Chambers.  Mlynarek yelled "Let's go" several times toward the crowd and House Chamber doors.  A few seconds later, the crowd started shouting "Break it down!"

Around 2:45 p.m., Mlynarek and Balhorn walked back through the Statuary Hall Connector and into Statuary Hall.  A minute later, they entered the Capitol Rotunda.  They exited the Rotunda at 2:47 p.m. through the south door towards the Senate Wing.  After they left the Rotunda, Mlynarek and Balhorn exited the U.S. Capitol Building via the Senate Wing door at approximately 2:50 p.m.  Ultimately, Mlynarek and Balhorn trespassed within the U.S. Capitol

16

Building for approximately 28 minutes.

*Defendants Mlynarek's and Balhorn's Statements and Media*

The defendants were not remorseful for their actions.  Rather, they were proud.  Among other things, Mlynarek took numerous photos and videos of their attack on the Capitol, such as:

- Photos from Mlynarek's phone documenting their crimes, including their disorderly conduct outside the U.S. House Chamber. *See, e.g.*, Image 10 (Government Exhibit 219).

*Image 10*



- A photo from Mlynarek's phone documenting downed snow fencing. Image 11 (Government Exhibit 203).

*Image 11*



- A video from Mlynarek's phone showing shattered windows of the U.S. Capitol Building.

Image 12 (still image of Government Exhibit 321).

*Image 12 (Screenshot from Exhibit 321 at 00:01)*



Mlynarek's decision to photograph and film his crimes suggests that he believed that what he did was not wrong, and indeed he was proud, indicating that a substantial sentence is necessary to deter Mlynarek.

Balhorn and Mlynarek also bragged about their actions to each other, and to the world. For instance, Mlynarek sent a message while at the U.S. Capitol which he captioned, "took this bitch over." Government Exhibit 201.  On the day of their attack, later that evening, Mlynarek texted Balhorn, "Told u we should have stayed!" Balhorn replied, "Nope we left in time. We got in. Let the idiots do the rest."  Government Exhibit 205.  Mlynarek also texted Balhorn that one would "need a bomb" to break through the fortified doors of the U.S. Capitol, to which Balhorn responded "[y]ep."  *Id.*

Indeed, Mlynarek shared a short manifesto:  "It's not about Trump or Biden or color. Its about America. It's about these motherfuckers thinking they can . . . have bullshit rigged elections . . . .  [U]nderstand patriots are gonna stand up and fight for what we believe in and if u have a problem with that then fuck off and stay out of the way."  Government Exhibit 704.

Balhorn was similarly loquacious.  He sent a long text message to Mlynarek laying out his ideology, saying in part that "we will continue to have a civil unrest until the government handles it's [sic] responsibilities properly." Government Exhibit 205.

*The Charges and Plea*

On April 5, 2023, the United States charged Defendants Mlynarek and Balhorn by a seven-count Indictment with violating: 18 U.S.C. § 231(a)(3) (Civil Disorder), Count One (both defendants); 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), Count Two (Mlynarek); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), Count Three (Mlynarek); 18 U.S.C. §§ 1752(a)(1) and

(b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon), Count Four (Balhorn); 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon), Count Five (Balhorn); 40 U.S.C. § 5104(e)(2)(D) (Disorderly or Disruptive Conduct in the Capitol Grounds or Buildings), Count Six (both defendants), and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building), Count Seven (both defendants). *See* ECF No. 22 (Indictment).

On October 16, 2023, Mlynarek pleaded guilty, without a plea agreement, to Counts Two, Three, Six, and Seven of the Indictment. ECF No. 50 (Statement of Elements and Elements and Facts for Change of Plea Hearing). On October 18, 2023, this Court convicted Balhorn of Count Seven of the Indictment. This Court also found Balhorn not guilty as to Counts Four and Five, but guilty as to the lesser included offenses, convicting him of violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds) and 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds). Minute Order (October 18, 2023).

All seven counts and their outcomes are represented by the following table:

| | Kyle Mlynarek | Ronald Balhorn |
|---|---|---|
| **(1) Civil Disorder, in violation of Title 18, United States Code, Section 231(a)(3)** | Acquitted | Acquitted |
| **(2) Entering and Remaining in a Restricted Building or Grounds, in violation of Title 18, United States Code, Section 1752(a)(l)** | <u>Pled Guilty</u> | Not Applicable |
| **(3) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of Title 18, United States Code, Section 1752(a)(2)** | <u>Pled Guilty</u> | Not Applicable |
| **(4) Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of Title 18, United States Code, Sections 1752(a)(1) and (b)(l)(A)** | Not Applicable | <u>Convicted of Lesser Included Offense</u> of Entering and Remaining in a Restricted Building or Grounds |
| **(5) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of Title 18, United States Code, Sections 1752(a)(2) and (b)(1)(A)** | Not Applicable | <u>Convicted of Lesser Included Offense</u> of Disorderly and Disruptive Conduct in a Restricted Building or Grounds |
| **(6) Disorderly Conduct in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(D)** | <u>Pled Guilty</u> | Acquitted |
| **(7) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G)** | <u>Pled Guilty</u> | <u>Convicted</u> |

## IV.    Statutory Penalties

Defendants Mlynarek and Balhorn now face a sentencing for:

- entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (both defendants);

- disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (both defendants);

21

- disorderly conduct in a capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Mlynarek only); and

- parading, demonstrating, or picketing in a capitol building, in violation 40 U.S.C. § 5104(e)(2)(G) (both defendants).

Violations of 18 U.S.C. § 1752(a)(1) and (2) carry a maximum sentence of one (1) year of imprisonment each; a fine of $100,000 each, pursuant to 18 U.S.C. § 3571(b)(5); a term of supervised release of not more than 1 year each, pursuant to 18 U.S.C. § 3583(b)(3); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

Violations of 40 U.S.C. § 5104(e)(2)(D) and (G) carry a maximum sentence of six (6) months of imprisonment each, pursuant to 40 U.S.C. § 5109(b); a term of probation of not more than five (5) years each, pursuant to 18 U.S.C. § 3561(c); a fine of not more than $5,000 each, pursuant to 18 U.S.C. § 3571(b)(6); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

## V.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

22

### A. Defendant Mlynarek Sentencing Guidelines Analysis

The government agrees with the Sentencing Guidelines total offense level set forth in the PSR.  *See* ECF 59 ("Mlynarek Draft PSR") at ¶ 39.  However, the PSR does not include a full Guidelines analysis for all counts of conviction. *See* Mlynarek Draft PSR at ¶¶ 30-39.[4]  The U.S. Probation Office correctly calculated the offense level for Count Two under the Sentencing Guidelines as follows:

*Count Two* (18 U.S.C. § 1752(a)(1)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | +10 |
| Specific Offense Characteristics (§2A2.4(b)(1)(A)-Physical Contact) | +3 |
| Total Adjusted Offense Level | +13 |

*See* Mlynarek Draft PSR at ¶¶ 31-36.  However, as paragraph 27 in the Mlynarek Draft PSR notes, the correct initial guideline for Count Two is U.S.S.G. § 2B2.3.[5]  *See* Mlynarek Draft PSR at ¶ 27.  The full Guidelines analysis for Count Two is as follows:

---

[4] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The draft PSR does not follow these steps. It concludes that Counts Two and Three group (Mlynarek Draft PSR at ¶ 30) —a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

[5] The Statutory Index lists two guidelines for 18 U.S.C. § 1752: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass).  Since Section 1752(a)(1) is a trespass statute, § 2B2.3 is "the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." Appendix A, Introduction; *see also* U.S.S.G. § 1B1.2(a); U.S.S.G. § 2X5.1.

**Count Two: 18 U.S.C. 1752(a)(1)—Entering and Remaining in a Restricted Building or Grounds**

| Base offense level | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic (Restricted Building) | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): The trespass occurred "at any restricted building or grounds." <br><br> On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting (namely then-Vice President Mike Pence). *See* 18 U.S.C. § 1752(c)(1)(B). |
| *Cross Reference* | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." <br><br> Although Mlynarek was acquitted of Obstructing or Impeding Officers During a Civil Disorder in violation of 18 U.S.C. § 231(a)(3), as charged in Count One, the evidence at trial was sufficient to prove, by a preponderance, that Mlynarek *intended* to obstruct, impede, or interfere with law enforcement officers lawfully engaged in the lawful performance of their official duties (protecting and defending the Capitol) incident to and during the commission of a civil disorder which obstructed, delayed, or adversely affected commerce or the conduct or performance of any federally protected function.[6] <br><br> In his Statement of Elements and Facts for his Charge of Plea Hearing, Defendant Mlynarek, through |

---

[6] Videos and other evidence shown at trial and included with this sentencing memorandum establish by a preponderance of evidence that Mlynarek and Balhorn had such intent to obstruct, impede, or interfere with law enforcement officers lawfully engaged in the lawful performance of their official duties during the commission of a civil disorder. In reaching its conclusion, the Court may consider all evidence, including uncharged and acquitted conduct as discussed above in the Section II, Post-Trial Legal Standards. At least two judges in this district have applied the cross-reference in U.S.S.G. § 2B2.3(c)(1) to the guideline for an acquitted felony. See *United States v. Thomas*, D.D.C. 21-cr-552 (DLF), Sentencing Transcript at 80 (November 15, 2023) ("apply[ing] the cross-reference in 2B2.3 to the obstruction guideline" U.S.S.G. § 2J1.2, where the defendant had been acquitted of the obstruction of an official proceeding charge); *United States v. Ralph Celentano, III*, 22-cr-186 (TJK) (similarly applying the cross-reference in 2B2.3 to the obstruction

| | | counsel, stipulated that the civil disorder on the grounds of the U.S. Capitol and in the U.S. Capitol Building on January 6, 2021, as described above, obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce as those terms are used in 18 U.S.C. § 231(a)(3). *See* ECF 50 ("Mlynarek Statement of Elements and Facts") at 5-6. |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a)[7] |
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact… increase by 3 levels."<br><br>As discussed above, Mlynarek engaged in a physical struggle with a U.S. Capitol Police officer on the West Terrace as he maneuvered to enter the U.S. Capitol Building.[8] |
| **Total** | **13** | |

Additionally, the PSR does not include a Guidelines analysis for Count Three. *See* Mlynarek Draft PSR at ¶¶30-39.  The Guidelines analysis for Count Three is as follows:

*Determining the Applicable Guideline for 18 U.S.C. § 1752(a)(2)*

As noted above, the Statutory Index lists two guidelines for 18 U.S.C. § 1752: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass).   If more than one Guidelines provision may apply to a particular offense, the court should "use the guideline most appropriate

---

guideline, U.S.S.G. § 2J1.2, where the defendant had been acquitted of the obstruction of an official proceeding charge) (sentencing transcript pending).

[7] U.S.S.G. § 2X1.1(a) calls for the use of "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."  Here, the substantive offense, obstructing or impeding officers during a civil disorder in violation of 18 U.S.C. § 231(a)(3), does not have a specified Chapter Two Guideline.  Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, "the most analogous guideline" must be used.  U.S.S.G. § 2X5.1.  Here, the most analogous guideline to obstructing or impeding officers during a civil disorder is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

[8] Paragraph 32 in the Mlynarek Draft PSR also notes as support for the physical contact enhancement, pursuant to U.S.S.G. § 2A2.4(b)(1)(A), that Mlynarek additionally "joined a scrum attacking officers on the West Lawn."  *See* Mlynarek Draft PSR at ¶ 32.

for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2 cmt. n.1.  The "most appropriate" of the two potentially applicable guideline provisions is the one that best reflects the "offense conduct charged" in the count of conviction, based on a consideration of the elements of the offense. U.S.S.G. § 1B1.2 cmt. n.1; *accord id.* § 1B1.2(a).

Under this standard, the most appropriate guidelines for a Section 1752(a)(2) offense is Section 2A2.4.  Section 1752(a)(2) criminalizes "engag[ing] in disorderly or disruptive conduct" that "in fact, impedes or disrupts the orderly conduct of Government business or official functions."  18 U.S.C. § 1752(a)(2).  As noted above, Section 2A2.4 is entitled "Obstructing or Impeding Officers," a title that parallels Section 1752(a)(2)'s requirement that the defendant have "in fact" "impede[d] or disrupt[ed] . . . Government business or official functions" undertaken by government officials.

The contrast with Section 1752(a)(2)'s neighboring provision, Section 1752(a)(1), clarifies even further that Section 2A2.4, not 2B2.3, is the appropriate guidelines provision.  Section 1752(a)(1) criminalizes merely "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority"—functionally, illegal trespass on Capitol grounds.  The most appropriate guidelines provision for that offense is thus plainly Section 2B2.3, which covers "Trespass."  But an offense like Section 1752(a)(2), which requires that the defendant both have engaged in disorderly or disruptive conduct and in fact have impeded government officials conducting official business, is not captured by a mere "Trespass" guideline.  It does, however, correspond closely to an "Obstructing or Impeding Officers" guideline.

Moreover, even if one assumed that Section 2A2.4's "Obstruction" guidelines do not perfectly reflect the offense conduct of a Section 1752(a)(2) offense, that does not mean Section 2B2.3 applies.  The only question under the guidelines is which of the two guidelines provisions

better captures—even if only slightly better—the offense conduct. And here, a guidelines provision for "Obstructing or Impeding Officers" clearly is closer to reflecting the offense conduct (disorderly and disruptive conduct that impeded government officials) than a guidelines provision for "Trespass," which does not reflect disorderly or disruptive conduct at all or interference with government officials at all.

Finally, although the "most appropriate" guideline should be determined only by the "offense conduct charged"—that is, the elements of the Section 1752(a)(2) offense—the facts of this particular case also favor application of Section 2A2.4. In this case, there are specific officers whose official functions were impeded by Mlynarek and Balhorn's conduct: MPD officers on the West Lawn who were attempting to provide back up to other officers before they themselves were confronted by Mlynarek, Balhorn, and other rioters, and attacked, and at least one officer on the Northwest Terrace who was pushed and shoved by Mlynarek and Balhorn as they proceeded to enter the Capitol Building that the officers were there to protect.

**Count Three: 18 U.S.C. 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

| | | |
|---|---|---|
| Base offense level | 10 | U.S.S.G. §2A2.4(a) |
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact… increase by 3 levels." <br><br> As discussed above, Mlynarek engaged in a physical struggle with a U.S. Capitol Police officer on the West Terrace as he maneuvered to enter the U.S. Capitol Building.[9] |
| **Total** | **13** | |

---

[9] Paragraph 32 in the Mlynarek Draft PSR also notes (under Count Two) as support for the physical contact enhancement pursuant to U.S.S.G. § 2A2.4(b)(1)(A), that Mlynarek additionally "joined a scrum attacking officers on the West Lawn." *See* Mlynarek Draft PSR at ¶ 32.

Violations of 40 U.S.C. § 5104(e)(2)(D) and (G) are Class B misdemeanors to which the Sentencing Guidelines do not apply.  *See* 40 U.S.C. § 5109(b) (punishing Section 5104(e)(2) offenses with a maximum of 6 months' imprisonment); 18 U.S.C. § 3559(a)(7) (classifying offenses with a maximum of 6 months' imprisonment as Class B misdemeanors); U.S.S.G. §1B1.9 ("The sentencing guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.").

*Grouping Analysis*

Under U.S.S.G. §3D1.2(a)-(c), "closely related counts" group.  Count Two (Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1)) and Count Three (Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2)) group because they have the same victim:  Congress.  *See* U.S.S.G. §3D1.2(a) and (b).  The offense level for that Group is "the highest offense level of the counts in the Group," pursuant to § 3D1.3(a).  *See* U.S.S.G. § 3D1.3(a); *see also* U.S.S.G. § 3D1.4, comment. n. 1 (noting that when the analysis in §§ 3D1.2 and 3D1.3 results in a single group, the combined offense level for that group is simply the offense level for the group as determined under § 3D1.3).  Here, the highest offense level is 13, so the offense level for the Group is 13.

*Acceptance of Responsibility*

The government notes that Mlynarek ultimately pleaded guilty to all four misdemeanors charged against him (including stipulating to some facts underlying his guilt), and only went to trial on the felony Section 231(a)(3) charge of which he was acquitted.  Consequently, the government does not currently oppose the application of a two-level reduction for acceptance of

responsibility, pursuant to § 3E1.1(a), to Mlynarek's total offense level.[10]   *See* U.S.S.G. § 3E1.1,

comment. n. 1(A) (noting that appropriate considerations for whether § 3E1.1(a) applies include a

defendant "truthfully admitting the conduct comprising the offense(s) of conviction"); U.S.S.G. §

3E1.1, comment. n. 3 (noting that entry of a guilty plea with regard to the offenses of conviction

provides significant evidence of acceptance of responsibility for the purposes of § 3E1.1(a); *U.S.*

*v. Dozier*, 162 F.3d 120, 127 (D.C. Cir. 1998) (including dicta suggesting that if the defendant had

gone "to trial to contest his guilt on the drug charges [of which he was acquitted], while admitting

his ownership of the gun and ammunition [the two charges of which he was convicted] . . . he

would not now be ineligible for the downward adjustment [for   acceptance of responsibility

pursuant to U.S.S.G. § 3E1.1] he seeks.").   However, because Mlynarek's total offense level

without an acceptance of responsibility reduction is less than 16, Mlynarek is not entitled to the

additional one-level reduction pursuant to § 3E1.1(b).   *See* U.S.S.G. § 3E1.1(b).   Accordingly,

with the two-level reduction pursuant to § 3E1.1(a), Mlynarek's offense level is 11.   *See* Mlynarek

Draft PSR ¶ 39.

*Inapplicability of U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders)*

A two-level reduction in the offense level determined under Chapters Two and Three is

generally available for defendants who do not receive any criminal history points under Chapter

Four, Part A and whose instant offense did not involve specified aggravating factors, pursuant to

§ 4C1.1.   *See* U.S.S.G. § 4C1.1(a).   Here, because Mlynarek has criminal history points as

---

[10] As the U.S.S.G. commentary notes, "[a] defendant who enters a guilty plea is not entitled to an
adjustment under [§ 3E1.1] as a matter of right," and any evidence of acceptance of responsibility,
such as pleading guilty to all offenses of conviction, "may be outweighed by conduct of the
defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, comment.
n. 3.   Accordingly, if the government becomes aware of any conduct inconsistent with Mlynarek's
acceptance of responsibility, it will oppose the two-level reduction under § 3E1.1(a).

discussed below, he is ineligible for the two-level reduction. *See* Mlynarek Draft PSR at ¶ 37; U.S.S.G. § 4C1.1(a)(1) (noting that the downward adjustment under 4C1.1(a) requires that "the defendant did not receive any criminal history points from Chapter Four, Part A."). Accordingly, his offense level remains 11.

<div align="center">

*Criminal History and Guidelines Range*

</div>

The U.S. Probation Office calculated Mlynarek's criminal history as Category I, based on a criminal history score of one for Mlynarek's 2018 operation conviction for operating while impaired by liquor. *See* Mlynarek Draft PSR at ¶¶ 41-42. Accordingly, because the U.S. Probation Office correctly calculated Mlynarek's total adjusted offense level, after acceptance, as 11, his corresponding Guidelines imprisonment range is 8-14 months. *See* Mlynarek Draft PSR at ¶ 96.[11]

### B. Defendant Balhorn Sentencing Guidelines Analysis

The government agrees with the Sentencing Guidelines total offense level set forth in the PSR. *See* ECF 58 ("Balhorn Draft PSR") at ¶ 41. However, the PSR does not include a full Guidelines analysis for all counts of conviction. *See* Balhorn Draft PSR at ¶¶ 32-41.[12] The U.S.

---

[11] Although the PSR correctly calculates the Guidelines imprisonment range as 8-14 months, it incorrectly cites U.S.S.G. § 5G1.1(c) as a reason to cap that range at 12 months (the maximum amount of imprisonment allowed for a single Class A misdemeanor). *See* Mlynarek Draft PSR at ¶ 96. U.S.S.G. § 5G1.1 (Sentencing on a Single Count of Conviction) does *not* apply to cases where there is more than one count of conviction. Instead, § 5G1.2 (Sentencing on Multiple Counts of Conviction) is the applicable provision when there are multiple counts of conviction, and where the Guidelines imprisonment range is higher than the statutory maximum for any one count, the Court may impose consecutive or partially consecutive sentences on more than one count to get a total sentence of confinement that is within the Guidelines imprisonment range. *See* U.S.S.G. § 5G1.2(d).

[12] As discussed above, under U.S.S.G. § 1B1.1(a)(4), a full Guidelines analysis must be "repeat[ed]" for "each count" before it is appropriate to apply Chapter 3 grouping analysis. The draft PSR does not follow these steps. It concludes that Counts Four and Five group (Balhorn Draft PSR at ¶ 32) —a conclusion with which the government agrees—but does not set forth the required Guidelines calculation for each count.

Probation Office correctly calculated the offense level for Count Four under the Sentencing Guidelines as follows:

*Count Four* (Lesser included offense – 18 U.S.C. § 1752(a)(1)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | +10 |
| Specific Offense Characteristics ((§2A2.4(b)(1)(A)-Physical Contact) | +3 |
| Total Adjusted Offense Level | +13 |

*See* Balhorn Draft PSR at ¶¶ 33-38.  However, as paragraph 32 in the Balhorn Draft PSR notes, the correct initial guideline for Count Four is U.S.S.G. § 2B2.3.  *See* Balhorn Draft PSR at ¶ 32.

The full Guidelines analysis for Count Four is as follows:

### Count Four (Lesser included offense): 18 U.S.C. 1752(a)(1)—Entering and Remaining in a Restricted Building or Grounds

| Base offense level | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic (Restricted Building) | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): The trespass occurred "at any restricted building or grounds." <br><br> On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting (namely then-Vice President Mike Pence).  *See* 18 U.S.C. § 1752(c)(1)(B). |
| *Cross Reference* | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." <br><br> Although Balhorn was acquitted of Obstructing or Impeding Officers During a Civil Disorder in violation of 18 U.S.C. § 231(a)(3), as charged in Count One, the evidence at trial was sufficient to prove, by a preponderance, that Balhorn *intended* to obstruct, impede, or interfere with law enforcement officers lawfully engaged in the lawful performance of their official duties (protecting and defending the Capitol) incident to and during the commission of a civil disorder which obstructed, delayed, or adversely affected commerce or the conduct or performance of any federally protected function. In Government |

| | | Exhibit 1000 the parties stipulated to the fact the civil disorder on the grounds of the U.S. Capitol and in the U.S. Capitol Building on January 6, 2021, as described above, obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce as those terms are used in 18 U.S.C. § 231(a)(3). |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a)[13] |
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact… increase by 3 levels." As discussed above, Balhorn engaged in a physical struggle with a U.S. Capitol Police officer on the West Terrace as he maneuvered to enter the U.S. Capitol Building.[14] |
| **Total** | **13** | |

Additionally, the PSR does not include a Guidelines analysis for Count Five. *See* Balhorn

Draft PSR at ¶¶ 32-41.  The Guidelines analysis for Count Five is as follows:

### Count Five (Lesser included offense): 18 U.S.C. 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds

| Base offense level | 10 | U.S.S.G. §2A2.4(a)[15] |
|---|---|---|
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact… increase by 3 levels." As discussed above, Balhorn engaged in a physical struggle with a U.S. Capitol Police officer on the West |

---

[13] As discussed above, U.S.S.G. § 2X1.1(a) calls for the use of the guideline for the substantive offense.  Here, the substantive offense, obstructing or impeding officers during a civil disorder in violation of 18 U.S.C. § 231(a)(3), does not have a specified Chapter Two Guideline, so the most analogous guideline – U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers" – must be used.

[14] Paragraph 34 in the Balhorn Draft PSR also notes as support for the physical contact enhancement, pursuant to U.S.S.G. § 2A2.4(b)(1)(A), that Balhorn additionally "joined a scrum attacking officers on the West Lawn."  *See* Balhorn Draft PSR at ¶ 34.

[15] As discussed above, the Statutory Index lists two guidelines for 18 U.S.C. § 1752: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass).  Unlike the Entering and Remaining in a Restricted Building or Grounds offense in Section 1752(a)(1), Section 1752(a)(2) involves disorderly and disruptive conduct and not mere trespass.  Accordingly, U.S.S.G. § 2A2.4, it is "the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." Appendix A, Introduction; *see also* U.S.S.G. § 1B1.2(a) and § 2X5.1.

| | | Terrace as he maneuvered to enter the U.S. Capitol Building.[16] |
|---|---|---|
| **Total** | **13** | |

As discussed above, violations of 40 U.S.C. § 5104(e)(2)(G) are Class B misdemeanors to which the Sentencing Guidelines do not apply. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

<div align="center">

*Grouping Analysis*

</div>

Under U.S.S.G. §3D1.2(a)-(c), "closely related counts" group. Count Four's lesser included offense (Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1)) and Count Five's lesser included offense (Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2)) group because they have the same victim: Congress. *See* U.S.S.G. § 3D1.2(a) and (b). The offense level for that Group is "the highest offense level of the counts in the Group," pursuant to § 3D1.3(a). *See* U.S.S.G. § 3D1.3(a); *see also* U.S.S.G. § 3D1.4, comment. n. 1 (noting that when the analysis in §§ 3D1.2 and 3D1.3 results in a single group, the combined offense level for that group is simply the offense level for that group as determined under § 3D1.3). Here, the highest offense level is 13, so the offense level for the Group is 13.

<div align="center">

*Acceptance of Responsibility*

</div>

Balhorn did not accept responsibility. Instead, he contested factual guilt and went to trial on all charges against him, including his three charges of conviction. Accordingly, he is not entitled to the minus-two adjustment under U.S.S.G. § 3E1.1(a). *See* Balhorn Draft PSR ¶ 25; *see*

---

[16] Paragraph 34 in the Balhorn Draft PSR also notes (under Count Four) as support for the physical contact enhancement pursuant to U.S.S.G. § 2A2.4(b)(1)(A), that Balhorn additionally "joined a scrum attacking officers on the West Lawn." *See* Balhorn Draft PSR at ¶ 34.

*also* U.S.S.G. § 3E1.1, comment. n. 2 ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, [and] is convicted"); *U.S. v. Dozier*, 162 F.3d 120, 126–27 (D.C. Cir. 1998) (finding that the defendant was ineligible for the 3E1.1(a) two-level downward adjustment for acceptance of responsibility where he went to trial and was acquitted of three drug charges but convicted of two firearms offenses).  Additionally, because Balhorn is ineligible for the § 3E1.1(a) adjustment, he is also ineligible for the § 3E1.1(b) adjustment. *See* U.S.S.G. § 3E1.1(b).

> *Inapplicability of U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders)*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply to Defendant Balhorn, for the following reasons:  *First*, Defendant Balhorn engaged in a physical altercation with a U.S. Capitol Police Officer.  In Government Exhibit 317 (time: 19:15), Defendant Balhorn can be observed struggling with an officer to move past on the Terrace. *See* Image 5–9.  As the officer tried to prevent Balhorn and Mlynarek from advancing, Balhorn pushed the officer, and Mlynarek rushed back to help shove the officer to the side.  *See* Image 5–9. After this struggle, Balhorn continued walking on the Terrace, toward the Senate Wing Door, which Balhorn used when entering the U.S. Capitol. Because of this physical altercation, Balhorn cannot qualify for a two-level decrease in the offense level as violence was in the commission of the offense. *See* U.S.S.G. § 4C1.1(a)(3) (noting that the 4C1.1. downward adjustment only applies if "the defendant did not use violence or credible threats of violence in connection with the offense").  Courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence to the Capitol. *See United States v. Dillard*,

23-CR-49 (JMC), *United States v. Pavlik*, 23-CR-45 (TNM), *United States v. Herrington*, 23-CR-199 (BAH).  If the Court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

*Second*, the Court should not apply § 4C1.1 here for the reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of ensuring the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 607 F. Supp. 3d 1, 9 (D.D.C. 2022), *aff'd,* No. 22-3088, 2023 WL 8594077 (D.C. Cir. Dec. 12, 2023) ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Additionally, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.  Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for

defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Finally, due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.[17] Without the § 4C1.1 downward adjustment, Balhorn's offense level remains 13.

*Criminal History and Guidelines Range*

The U.S. Probation Office calculated Balhorn's criminal history as Category I, based on a criminal history score of zero. *See* Balhorn Draft PSR at ¶ 44. Accordingly, the U.S. Probation Office correctly calculated Balhorn's total adjusted offense level at 13, his corresponding Guidelines imprisonment range is 12-18 months. *See* Balhorn Draft PSR at ¶ 87.[18]

---

[17] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and their applicable guideline range is in either Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

[18] Although the PSR correctly calculates the Guidelines imprisonment range as 12-18 months, it incorrectly cites U.S.S.G. § 5G1.1(c) as a reason to cap that range at 12 months (the maximum amount of imprisonment allowed for a single Class A misdemeanor). *See* Balhorn Draft PSR at ¶ 87. However, as discussed above, U.S.S.G. § 5G1.1 (Sentencing on a Single Count of Conviction) does *not* apply to cases where there is more than one count of conviction. Instead, § 5G1.2 (Sentencing on Multiple Counts of Conviction) is the applicable provision, and where the Guidelines imprisonment range is higher than the statutory maximum for any one count, the Court may impose consecutive or partially consecutive sentences on more than one count to get a

## VI.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of the recommended incarceration for Mlynarek and Balhorn.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing the defendants' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

One of the most important factors in Mlynarek and Balhorn's cases is that they engaged in direct physical altercations with police officers—shoving an officer trying to stop them from entering the Capitol Building—as established by a preponderance of the evidence, distinguishing them from many other misdemeanor defendants.  They also remained in the Capitol Building for a long duration (almost half an hour), traveling to several different locations through the building, during a particularly tumultuous time during the riot.  Between 2:22 p.m. and 2:50 p.m., the Northwest Terrace was breached; U.S. Capitol Police personnel begin evacuating Members inside the House Chamber; and the Senate Chamber was breached.  Police forces were already being

total sentence of confinement that is within the Guidelines imprisonment range. *See* U.S.S.G. § 5G1.2(d).

divvied up and stretched thin by the sheer volume of rioters and the number of locations they were breaching, and Mlynarek and Balhorn not only entered the building but remained inside during all of that chaos.  Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Defendant Mlynarek's History and Characteristics

As set forth in the PSR, Mlynarek's criminal history consists of a 2018 arrest and conviction for Operating While Impaired by Liquor.  *See* Mlynarek Draft PSR at ¶ 41. Additionally, Mlynarek had a 2017 arrest for Narcotic Equipment-Paraphernalia and Marijuana-Possession.  *See* Mlynarek Draft PSR at ¶ 58.  Finally, the Livonia Police Department ("LPD") in Michigan reported that, on July 9, 2021, the LPD responded to the scene of an overdose, where a small baggie containing suspected heroin was found in Mlynarek's cargo pants pocket.  *See* Mlynarek Draft PSR at ¶ 75.

### C.  Defendant Balhorn's History and Characteristics

As set forth in the PSR, Balhorn does not have a criminal history.  Balhorn owns a demolition business with five employees, including Mlynarek.  Balhorn's contributions to his business are not mitigating to the crimes he committed.  Balhorn was aware of any obligations he had to his business when he committed his crimes.  Moreover, Balhorn—along with his girlfriend—invited Mlynarek, one of his employees, to Washington, D.C. and coordinated his travel.

Finally, Balhorn has not complied with his condition of release.  On January 5, 2024, Pretrial Services Agency ("PSA") provided a status update on Balhorn's non-compliance with his conditions of release.  ECF No. 55 at 2.  In violation of the conditions of his release, Balhorn has tested positive for marijuana on eight occasions since his February 9, 2023 release, including one

instance post-conviction.  *Id.* ("The defendant tested positive for marijuana on 02/27/23, 03/28/23, 04/28/23, 06/01/23, 07/10/23, 09/05/23, 10/10/23, and 12/21/23"); *see also* Balhorn Draft PSR at ¶¶ 6 and 63.  PSA verbally warned Balhorn after each of the eight instances of non-compliance. *Id.*

### D.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.").

### E.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by these defendants.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  There is possibly no greater factor that this Court must consider.

As the Court is well aware, another presidential election—and another test of our democracy—is approaching.  As government institutions are attacked, meaningful deterrence is necessary to dissuade future threats on our democracy.[19]

*Specific Deterrence*

Although Mlynarek accepted some responsibility by pleading to some of the charges in his case, his post-January 6 conduct and statements are troubling.  Mlynarek has shown weak expressions of remorse, and even then only after indictment.  At various times on January 6, Mlynarek encouraged the riotous mob by yelling "Let's go," gloated about his accomplishments on Snapchat stating, "took this bitch over," and ultimately proclaimed that he should have stayed within the U.S. Capitol longer.  *See supra* Section II.  In fact, Mlynarek bragged about his crimes through long social media diatribes.  *See, e.g.*, Government Exhibit 704 ("[P]atriots are gonna

---

[19] *See, e.g.*, Dakin Andone *et al.*, *Man breaks into Colorado Supreme Court overnight and opens fire, police say*, CNN (Jan. 2, 2024), <https://www.cnn.com/2024/01/02/us/colorado-supreme-court-arrest/index.html>; Amy B. Wang and Maegan Vazquez, *Bomb threats force evacuations in several state capitols*, WASHINGTON POST (Jan. 3, 2024), <https://www.washingtonpost.com/politics/2024/01/03/bomb-threats-state-capitols/>; Brian Faler, *Trump tax return leaker sentenced to 5 years in prison*, POLITICO (Jan. 29, 2024), <https://www.politico.com/news/2024/01/29/irs-charles-littlejohn-tax-prison-trump-00138367> ("Judge Ana Reyes . . . focused on Littlejohn's decision to release Trump's filings, which Reyes called 'an attack on our constitutional democracy.' . . . 'It cannot be open season on our elected officials.'").

stand up and fight for what we believe in and if u have a problem with that then fuck off and stay out of the way."). Even Mlynarek's statements to Probation admitting involvement in the events of January 6, 2021 downplayed both his role in and the negative consequences of that day (*e.g.*, "In hindsight I realize there was no need to enter the capitol, *to me it was a great day for everybody to come together and cheer*, but I learned when taking things too far can lead into a wrong situation."; "The day me and the codefendant were arrested, *the local news channel put us on blast for no reason . . . .*"). Mlynarek Draft PSR at ¶ 24 (emphasis added).

Balhorn pled to nothing. Additionally, Balhorn showed no expressions of remorse. In fact, Balhorn was unremorseful in text messages following January 6, 2021, stating that "we will continue to have a civil unrest until the government handles it's [sic] responsibilities properly." Government Exhibit 205. Finally, this Court found that Balhorn unduly minimized his conduct when testifying. *See* Transcript, *U.S. v. Mlynarek et al.*, 23-CR-0114-ACR, at 179 (October 18, 2023) ("I do think he de-exaggerated, like I do not find credible that he didn't know that there were police right in front of him while he was standing on that ledge.").

Furthermore, Balhorn's release conditions provide that he "not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner." ECF No. 13, at 2. Marijuana is a Schedule I controlled substance. *See* 21 U.S.C. § 802 *et seq.* Balhorn has tested positive for marijuana on eight occasions since his February 9, 2023 release. ECF No. 55, at 2. After each instance, Balhorn received a verbal warning. *Id.* Nevertheless, Balhorn has shown disregard for the conditions of his release, PSA, and this Court, for his continued use of a controlled substance.

Moreover, beyond Mlynarek's plea, neither defendant has taken any serious steps to renounce their words and actions on January 6, 2021, either at trial or subsequently. Consequently,

the Court should view any remorse Mlynarek and Balhorn expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Given their general lack of remorse, and the very real possibility of future political violence in the coming year, a meaningful sentence is necessary to deter their and others' future crimes.

## F. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[20] This Court must sentence the defendants based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

*18 U.S.C. § 3553(a) Framework*

Mlynarek has pleaded guilty to Counts Two, Three, Six, and Seven of the Indictment, charging him with entering and remaining in a restricted building or grounds, in violation of 18

---

[20] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Balhorn has been convicted of the lessor included offense of Count Four, the lessor included offense of Count Five, and Count Seven of the Indictment, charging him with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); and parading, demonstrating, or picketing in a capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See*

*United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

 *Sentence Comparisons*

 Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case, as they are all misdemeanor convictions for disorderly and disruptive conduct in a restricted building or grounds (18 U.S.C. §1752(a)(2) involving physical contact with officers.

 In *United States v. Johnny Harris*, 21-cr-274 (RDM), defendant Harris pled guilty to one count of Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2).  Similar to Mlynarek, Harris witnessed violence between other rioters and police officers before entering the Capitol Building; yelled and provided encouragement to other rioters (urging other rioters to "move forward" and yelling "Whose house? Our house!");  stayed in the Capitol Building for a long time (approximately one hour) and traveled to multiple locations inside the building (including the Old Supreme Court Chamber, the Rotunda, and the Rotunda Door); ignored officer commands and physically pushed an officer (receiving a three-level enhancement pursuant to U.S.S.G. § 2A2.4(b)(1)(A) for physical contact with an officer); and bragged on social media about his participation in January 6.  Harris also received a two-level downward adjustment for acceptance of responsibility.

However, distinct from Harris, Mlynarek physically confronted officers in two locations, making indirect physical contact with CDU-42 by bracing the riotous crowd attacking officers on the West Lawn (as shown in Image 3) and engaging in another physical altercation with a U.S. Capitol Police officer on Northwest Terrace (as shown in Image 5–9).  Additionally, Harris had only one count of conviction, unlike Mlynarek.  Judge Moss sentenced Harris to seven months of incarceration, 12 months of supervised release, and $500 in restitution.  In the instant case, where Mlynarek engaged in more physical confrontations with police and has additional counts of conviction, a modestly higher sentence of nine months of incarceration is appropriate.

Similarly, comparable to Balhorn, Harris witnessed violence between other rioters and police officers before entering the Capitol Building; stayed in the Capitol Building for a long time and traveled to multiple locations inside the building; ignored officer commands and physically pushed an officer; and showed a lack of remorse in his statements to others after the riot.  Distinct from Harris, Balhorn did not plead guilty to any counts of conviction; Balhorn has multiple counts of conviction; Balhorn brought a family member then half his age to the Capitol; and Balhorn displayed a lack of full candor to the Court, including his unduly minimizing his conduct when testifying.  Accordingly, a more substantial increase in sentence is justified for Balhorn, and the Government requests a sentence of 13 months of incarceration.[21]

---

[21] The D.C. Circuit recently affirmed in another Capitol Siege case that sentencing disparities caused by acceptance of responsibility points and trial testimony (in that case, false testimony resulting in a two-level increase pursuant to U.S.S.G. § 3C1.1.) are reasonable.  *See United States v. Alford*, 89 F.4th 943, 953–54 (D.C. Cir. 2024) (affirming the district court's sentence of 12 months' incarceration for a defendant convicted at trial of 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G))  ("It was not unreasonable for the district court to conclude that [the defendant] warranted a sentence greater than other January 6th misdemeanors because he was ineligible for the acceptance-of-responsibility reduction and brought upon himself the penalty of a two-level enhancement through his testimony," particularly where the defendant was given a within-guidelines sentence that "is entitled to a 'presumption of reasonableness,' meaning that it

In *United States v. John Nassif*, 21-cr-421 (JDB), defendant Nassif was convicted by bench trial of violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2)(D) and (G). Similar to Mlynarek, Nassif witnessed confrontations between rioters and police officers before entering the Capitol Building; yelled and provided encouragement to other rioters (chanting "Who's House? Our house!" and telling other rioters to "keep fighting"); made physical contact with multiple officers; and discussed his participation in January 6th on social media.

Distinct from Mlynarek, Nassif received a two-level increase for obstruction of justice based on his false trial testimony (pursuant to U.S.S.G. § 3C1.1), and failed to receive the two-level decrease for acceptance of responsibility that Mlynarek seeks here. However, also distinct from Mlynarek, Judge Bates found that most of Nassif's physical contact with officers was "incidental" (caused by his being "jostled by the crowd") and in one instance it was an officer who made the contact (pushing back Nassif), and so Judge Bates declined to apply the three-level enhancement for physical contact with an officer pursuant to U.S.S.G. § 2A2.4(b)(1)(A).  *See* Sentencing Transcript, *U.S. v. Nassif*, 21-cr-421-JDB, at 21–22 (April 27, 2023).  Here, video shows that Mlynarek and Balhorn's contact with officers was not caused by jostling from the crowd, in fact, video makes clear that there was no crowd near defendants when they shoved and pushed the officer on the Northwest Terrace. *See* Image 5–9.  Additionally, Nassif spent only 10 minutes inside of the Capitol Building, a fraction of the time that Mlynarek and Balhorn spent inside.  Judge Bates sentenced Nassif to 7 months of incarceration, 12 months of supervised release, and $500 in restitution.  In the instant case, where Mlynarek's physical contact with multiple police officers was purposeful and not incidental, and where Mlynarek spent a much

---

'will almost never be reversed on appeal as substantively unreasonable.'")  (internal citations omitted).

longer time in the Capitol Building, a modestly higher sentence of 9 months of incarceration is appropriate.

Similarly, comparable to Balhorn, Nassif witnessed confrontations between rioters and police officers before entering the Capitol Building; made physical contact with multiple officers; showed a lack of remorse in his statements to others after the riot; displayed a lack of full candor to the Court in testifying (although Nassif's lack of candor rose to the level of obstruction of justice, meriting a two-level increase pursuant to U.S.S.G. § 3C1,1); and did not receive a downward adjustment for acceptance of responsibility. Distinct from Nassif, Balhorn's contact with officers was purposeful and not caused by jostling from the crowd; Balhorn spent approximately three times as much time inside of the Capitol Building as Nassif; and Balhorn brought a family member then half his age to the Capitol. Accordingly, a more substantial increase in sentence is justified for Balhorn, and the Government requests a sentence of 13 months of incarceration.

In *United States v, Glen Mitchell Simon*, 21-cr-00346 (BAH), defendant Simon pled guilty to one count of Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). Similar to Mlynarek, Simon made physical contact with officers (along with his fellow rioters, pushing a bicycle rack against a line of officers); witnessed violence between rioters and police officers before entering the Capitol Building; yelled and provided encouragement to other rioters (loudly urging his fellow rioters to put "fear" into the officers and to seek out Members of Congress); stayed in the Capitol Building for a long time (over an hour); publicly celebrated the riot after the fact (when interviewed by a local newspaper reporter a week afterwards); and had a prior criminal conviction (for disorderly conduct/fighting). Simon also received a two-level downward adjustment for acceptance of responsibility.

Distinct from Simon, Mlynarek confronted officers in two locations, as discussed above (making indirect physical contact with an officer on the West Lawn as shown in Image 4 and shoving another officer on Northwest Terrace as shown in Image 5–9).  Additionally, Simon had only one count conviction, unlike Mlynarek.  Then-Chief Judge Howell sentenced Simon to 8 months of incarceration, 12 months of supervised release, and $500 in restitution.  In the instant case, where Mlynarek engaged in more physical confrontations with police and has additional counts of conviction, a modestly higher sentence of 9 months of incarceration is appropriate.

Similarly, comparable to Balhorn, Simon made physical contact with officers; witnessed violence between rioters and police officers before entering the Capitol Building; stayed in the Capitol Building for a long time; and showed a lack of remorse in his statements to others after the riot.  Also, although Simon had a prior count of conviction and Balhorn does not, both Simon and Balhorn are Category I for criminal history.  Furthermore, distinct from Simon, Balhorn did not plead guilty to any counts of conviction; Balhorn has multiple counts of conviction; Balhorn brought a family member then half his age to the Capitol; and Balhorn displayed a lack of full candor to the Court, including his unduly minimizing his conduct when testifying.  Accordingly, a more substantial increase in sentence is justified for Balhorn, and the Government requests a sentence of 13 months of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VII.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096.  The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Mlynarek and Balhorn were both convicted of violations of offenses under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two

statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).  Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[22]

Because the defendants in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and their criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendants responsible for their individual contribution to the

---

[22] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses").  *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").  *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Mlynarek and Balhorn to each pay $500 in restitution for their convictions.  This amount fairly reflects Mlynarek's and Balhorn's roles in the offenses and the damages resulting from their conduct.  Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property.  Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Kyle Mlynarek to 9 months of incarceration, 12 months of supervised release, and $500 in restitution and Defendant Ronald Balhorn to 13 months of incarceration, 12 months of supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future attacks on our democratic institutions.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:    */s/ Pavan S. Krishnamurthy*
        Assistant United States Attorney
        D.C. Bar No. 252831
        601 D Street NW
        Washington, DC 20001
        (202) 252-7862
        pavan.krishnamurthy@usdoj.gov

        */s/ Brendan Ballou*
        Brendan Ballou
        DC Bar No. 241592
        Special Counsel
        United States Attorney's Office
        601 D Street NW
        Washington, DC 20001
        (202) 431-8493
        brendan.ballou-kelley@usdoj.gov

        */s/ Jack Burkhead*
        Jack Burkhead
        NM Bar No. 10493
        Assistant United States Attorney
        United States Attorney's Office
        601 D Street NW
        Washington, DC 20001

(202) 431-8493
jack.e.burkhead@usdoj.gov